# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

LINDA K. ZOSSO,               )
      Plaintiff,             )
                            )
     v.                   )       CAUSE NO.: 2:13-CV-150-PRC
                            )
CAROLYN W. COLVIN,        )
Acting Commissioner of the    )
Social Security Administration,  )
      Defendant.         )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Linda K. Zosso on April 30, 2013, and Plaintiff's Brief [DE 11], filed on August 30, 2013. Plaintiff requests that the January 24, 2012 decision of the Administrative Law Judge denying her claims for disability insurance benefits and supplemental security income be reversed for an award of benefits or remanded for further proceedings. On December 30, 2013, the Commissioner filed a response, and Plaintiff filed a reply on January 15, 2014. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

On July 14, 2010, Plaintiff Linda Zosso filed applications for disability insurance benefits and supplemental security income, alleging an onset date of March 6, 2009. The applications were denied initially on December 2, 2010, and upon reconsideration on March 2, 2011. Plaintiff filed a timely request for a hearing on March 16, 2011, which was held on January 6, 2012, before Administrative Law Judge ("ALJ") Henry Kramzyk. In appearance were Plaintiff, her non-attorney representative Joseph Kilroy, and vocational expert Richard T. Fisher. The ALJ issued a written decision denying benefits on January 24, 2012, making the following findings:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.  The claimant has not engaged in substantial gainful activity since March 6, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.  The claimant has the following medically determinable impairments: trigeminal neuralgia, degenerative changes of the cervical and lumbar spine, carpal tunnel syndrome, and affective disorder (20 CFR 404.1521 *et seq.*, and 416.921 *et seq.*).

4.  The claimant does not have an impairment or combination of impairments that has significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant does not have a severe impairment or combination of impairments (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

5.  The claimant has not been under a disability, as defined in the Social Security Act, from March 6, 2009, through the date of this decision (20 CRF 404.1520(c) and 416.920(c)).

(AR 19-29).

On February 27, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On April 30, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

### A. Medical Background

Plaintiff, born in 1963, was 45 years old at the time of her onset. She has a high school education and previously worked as a cashier supervisor and dental assistant.

1.    *Mauricio Orbegozo, M.D.—Treating Pain Management Specialist*

Prior to her onset date, Dr. Orbegozo treated Plaintiff for pain on the left side of the tongue following a dental procedure in October 2007, as well as tingling and numbness in the toes and fingers.

On March 9, 2009, Mauricio Morales, M.D., a colleague of Dr. Orbegozo, noted that Plaintiff presented for a refill of her medications (Cymbalta, Vicodin, and Klonopin). Her diagnoses included lingual neuropathy and neuralgia. Dr. Morales noted that Plaintiff had been to the emergency room multiple times for treatment of her pain. He reminded her that she could not request narcotics during those visits because she had a narcotic contract with his facility, the Pain Centers of Chicago ("PCC"). Dr. Morales refilled her medications.

On March 24, 2009, Plaintiff was treated in the emergency room for left tongue pain. On March 25, 2009, Plaintiff returned to Dr. Orbegozo, reporting severe pain over the previous two weeks. She reported taking seven to eight Vicodin pills per day due to her increasing pain and admitted that she failed to inform the facility about her increase in medication. On examination, Plaintiff was tearful at times and demonstrated some muscle tightness throughout the upper trapezius area bilaterally. She was diagnosed with lingual neuralgia. Dr. Orbegozo reminded Plaintiff about the terms of her narcotics contract and switched her medications from Vicodin to Kadian, Norco, and Flexeril.

On April 14, 2009, Plaintiff reported bilateral hand numbness and bilateral upper extremity pain over the previous two months. On May 1, 2009, she reported improved mouth symptoms but continued bilateral wrist numbness and swelling in the lower extremities. An MRI of the cervical spine dated May 1, 2009, revealed multilevel early disc degeneration and bulging annuli between the C3-C7 vertebrae as well as mild neural foraminal stenosis from C3-C6 vertebrae. A right shoulder MRI on May 1, 2009, showed mild bursitis.

On May 26, 2009, Plaintiff presented to Porter Valparaiso Hospital for an intramuscular injection of Dilaudid and Phenergan for symptoms of carpal tunnel syndrome. A physical examination noted positive Tinel's and Phalen's tests and mild weakness in hand strength. On May 28, 2009, Dr. Orbegozo noted a positive Tinel's sign on the right. He diagnosed her with carpal tunnel syndrome, right greater than left, and prescribed OxyContin.

On June 19, 2009, Plaintiff reported that she ran out of OxyContin six days early. The doctor indicated that he would no longer refill her medications early. Plaintiff returned on August 11, 2009, reporting that she was waking up with pain over the past two weeks. One of the doctors increased her dose of OxyContin. On September 6, 2009, Plaintiff reported improved sleep but was tearful, frustrated, and depressed due to her chronic pain. During an evaluation on October 15, 2009, Plaintiff noted progressively worsening symptoms over the past few months, but stated that her medications were somewhat helpful overall.

On November 20, 2009, Dr. Orbegozo administered a left-sided gasserian ganglion block injection, and Plaintiff reported relief. Plaintiff returned on January 6, 2010, with continued left tongue pain and rated her pain as a 10 on a scale of 1 to 10, with 10 being the greatest pain. On April 2, 2010, she reported that her pain was at 6 out of 10 and that she was no longer taking OxyContin

but still took three Norco pills per day. She underwent a second ganglion block injection on May 7, 2010, and reported pain relief. Plaintiff reported that the injection provided only three days of relief.

On May 19, 2010, Dr. Orbegozo prescribed Roxicodone. On June 11, 2010, Plaintiff reported her pain at 8 out of 10. On July 6, 2010, Plaintiff reported her pain at 6 out of 10. On September 8, 2010, Plaintiff reported relief and that her pain was at 2 out of 10.

On September 18, 2010, Plaintiff underwent a surgical placement of a pump reservoir and an intrathecal catheter at the level of the gasserian ganglion for administration of pain medication. On September 24, 2010, Plaintiff reported reduced pain, but had increased symptoms of nausea, headache, and anxiety. Dr. Morales indicated that her symptoms were consistent with withdrawal.

On October 1, 2010, Dr. Orbegozo diagnosed Plaintiff with trigeminal neuralgia. On October 28, 2010, Plaintiff indicated that the pump was ineffective without Dilaudid and that her pain was at 8 out of 10. On November 9, 2010, Dilaudid was added to her pump. On December 9, 2010, Plaintiff fell when going outside to start her car. She hit her back and head during the incident but was able to drive to her appointment with Dr. Orbegozo. She reported pain in the right leg radiating down to her toes when she drove her car long distances. Dr. Orbegozo recommended a lumbar spine MRI for further evaluation. On January 3, 2011, Plaintiff reported pain relief and that her pain was at 3 out of 10.

On March 3, 2011, Plaintiff reported low back pain radiating into the right lower extremity and associated it with difficulty sleeping. The lumbar spine MRI dated March 21, 2011, revealed mild scoliosis and mild diffuse disc bulges from L3-L4 to L5-S1.

On March 30, 2011, Plaintiff reported her pain at 8 on a scale of 1 to 10 and underwent an epidural steroid injection. On April 26, 2011, Plaintiff reported 40% relief of her symptoms from the injection and that her pain was at 6 out of 10. On June 20, 2011, Plaintiff reported her pain at 9 out of 10 (worsening down the right leg), depression, anhedonia, and decreased appetite. She reported improved pain relief with Neurontin on July 15, 2011.

On August 1, 2011, Dr. Orbegozo completed a letter regarding Plaintiff's impairments. He noted her history of treatment for lingual pain, including several narcotic medications and injections. The doctor indicated that Plaintiff had been unable to work throughout her treatment with him as a result of chronic pain. He added that Plaintiff recently began to develop symptoms in her right lower extremity. Dr. Orbegozo opined that Plaintiff was "totally incapacitated to work." *Id.*

On September 21, 2011, Dr. Orbegozo referred Plaintiff for an EMG study of her hands. The results of the testing revealed moderate to severe bilateral carpal tunnel syndrome, worse in the left wrist.

On September 21, 2011, Dr. Orbegozo also completed a Multiple Impairment Questionnaire. He diagnosed Plaintiff with atypical facial pain and lumbar degenerative disc disease. Clinical findings included facial and tongue pain and lower back pain with lower extremity pain. Dr. Orbegozo noted that the MRI of the lumbar spine supported his opinion. He opined that Plaintiff was limited to sitting for up to one hour total, standing/walking for up to one hour total, and occasionally lifting and/or carrying up to ten pounds during an eight-hour workday. Dr. Orbegozo also found that Plaintiff had significant limitations in doing repetitive reaching, handling, fingering, or lifting due to facial pain and lower back pain. He found that Plaintiff was incapable of tolerating even "low stress" work and would likely be absent from work more than three times per month as a result of

her impairments. He noted Plaintiff had good days and bad days. He added that Plaintiff needed to avoid exposure to noise, fumes, gases, temperature extremes, dust, and heights on a sustained basis. Dr. Orbegozo concluded that the symptoms and limitations described in the questionnaire had been present since he first treated her.

On October 10, 2011, Plaintiff reported her pain at a level of 7 out of 10. On November 9, 2011, Plaintiff reported bilateral hand pain, cramping, and numbness, as well as cramping in the leg and some back pain. Dr. Orbegozo discontinued Roxicodone and prescribed Dilaudid instead. He diagnosed Plaintiff with lumbar radiculopathy, atypical facial pain, and bilateral carpal tunnel syndrome. On December 9, 2011, Plaintiff reported renewed intermittent left facial pain.

*2.      Will County Medical Associates*

Plaintiff presented to Michael Cohen, M.D., on June 9, 2009. She reported numbness and tingling in the hands that interfered with her ability to sleep and worsened with talking on the phone and reading a newspaper. His physical examination revealed a positive Tinel's sign bilaterally. The doctor diagnosed Plaintiff with bilateral carpal tunnel syndrome.

Plaintiff returned to Dr. Cohen on June 29, 2009, two weeks after undergoing carpal tunnel release surgery. She reported no pain or paresthesias in either hand. On October 15, 2009, Dr. Cohen indicated that Plaintiff's symptoms had been resolved.

*3.      Saint Anthony Memorial/Thomas Ryan, D.O.*

Two years after the surgery and relief, Plaintiff presented to Dr. Ryan for an evaluation of recurrent bilateral wrist pain on December 20, 2011. His neurological examination noted positive Phalen's and Tinel's tests, as well as abnormally decreased median nerve motor function bilaterally.

He diagnosed Plaintiff with bilateral carpal tunnel syndrome and recommended another carpal tunnel release surgery.

On March 15, 2012, Plaintiff presented to Saint Anthony Memorial Hospital with right wrist pain related to an enlarging "bump." A physical examination noted a tender nodule in the right wrist. *Id.* She was diagnosed with a ganglion cyst.

### 4. *Nancy Link, Psy.D.—SSA Consultative Examiner*

Plaintiff was evaluated by Dr. Link on September 27, 2010. She reported fatigue, difficulty concentrating, some comparatively limited daily activities, frequent crying spells, lack of interest in grooming and bathing, irritability, and anhedonia. Although Plaintiff reported a lack of interest in grooming and bathing, she also reported she was capable of taking care of her basic needs with the assistance of her daughter. Dr. Link diagnosed Plaintiff with major depressive disorder, moderate, single episode, without inter-episode recovery. She rated Plaintiff's GAF at 62. The doctor opined that Plaintiff was moderately impaired in her ability to perform work-related mental activities.

## B. Plaintiff's Hearing Testimony

Plaintiff testified that she is unable to work because of chronic pain and the impact of taking several medications. She stated that she suffers from trigeminal nerve damage on the left side of her face and tongue as the result of oral surgery on October 3, 2007. Following this injury, she began making mistakes at work due to her pain. Plaintiff also has sciatic nerve pain radiating down her right leg, carpal tunnel syndrome, depression, anxiety, and headaches. Her facial pain is constant and associated with numbness and difficulty chewing.

Plaintiff's leg pain is characterized by severe cramping at night and burning during the day. She has pain in both wrists and hands that is associated with tingling and numbness. Her medications are somewhat helpful with her symptoms; she wears splints on both hands and had an intrathecal pain pump surgically implanted for her facial pain. Although her medications are helpful, they cause side effects, including grogginess and sleepiness.

Plaintiff testified that she could lift between five and ten pounds, walk up to a block without taking a break, stand for up to one hour, and sit for thirty minutes before having to change positions. She is able to bend, stoop, and crouch but cannot squat, manipulate buttons, pick up change, or loosen bottle caps. During the day, she can dust and fold laundry but does not sweep, vacuum, cook, or do the dishes. She does not drive because of all the medications she takes. She watches movies on television and visits with her daughter, but no longer has any hobbies. Plaintiff stated that she needs assistance with bathing.

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [the claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions."); *Zurawski*

*v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. § 404.1520(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's

RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite her limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## ANALYSIS

Plaintiff seeks reversal of the ALJ's decision, arguing that, in finding that Plaintiff does not suffer from a severe impairment, the ALJ improperly weighed the opinion of Dr. Orbegozo and improperly determined Plaintiff's credibility. The Commissioner contends that the ALJ considered the record under the appropriate regulatory framework and that substantial evidence supports his decision.

At step two of the sequential evaluation, an impairment is not severe if it does not significantly limit an individual's ability to perform basic work activities. 20 C.F.R. §§ 404.1521(a), 416.921(a). Basic work activities are "the abilities and aptitudes necessary to do most jobs," including "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. §§ 1521(b), 416.921(b). In other words, an impairment is "not severe" if the medical evidence establishes only "a slight abnormality (or a combination of slight

abnormalities) that have no more than a minimal effect on an individual's ability to do basic work activities." SSR 96-3p, 1996 WL 374181 (Jul. 2, 1996); SSR 85-28, 1985 WL 56856 (Jan. 1, 1985). At this step, the burden on the claimant is *de minimis*. *See Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990) (citing *Bowen v. Johnson*, 482 U.S. 922 (1987)).

The Court considers each of Plaintiff's arguments in turn.

**A. Weight to Treating Physician Opinion and State Agency Physician Opinion**

Plaintiff first argues that the ALJ improperly weighed her treating physician's opinion. When evaluating the opinion of a treating physician, an ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p; SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical

source with the case. 20 C.F.R. §§ 404.1527(c), 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek*, 390 F.3d at 503. The ALJ cannot pick and choose the evidence that favors his final decision; rather, the ALJ must articulate his analysis well enough for an appellate court to follow and review his reasoning. *Diaz*, 55 F.3d at 307.

In this case, Plaintiff's treating, board-certified pain management specialist, Dr. Orbegozo, opined that Plaintiff cannot perform even sedentary exertional work. Dr. Orbegozo stated that his opinions were based on clinical findings of facial and tongue pain, as well as lower back pain with lower extremity pain, and objective MRI imaging of the lumbar spine. Dr. Orbegozo treated Plaintiff throughout the relevant time period for the pain-related impairments at issue in this case.

The ALJ states that Plaintiff's treating physician's opinion regarding the severity of Plaintiff's pain was inconsistent with the physician's notes and, therefore, was not persuasive. In support, the ALJ identifies three instances in which the doctor documented relief over a period of three years. Yet, the ALJ appears to ignore other treatment notes between or after those three occasions that document the return of Plaintiff's pain at a level that appears to be almost as severe,

if not as severe, as the pain prior to treatment, for example: November 20, 2009–relief due to a gasserian ganglion block; January 6, 2010–subjective pain at a level of 10 on a scale of 1 to 10, with 10 being the most severe pain; April 2, 2010–subjective pain at 6 out of 10; May 7, 2010–relief due to another gasserian ganglion block; June 11, 2010–subjective pain at 8 out of 10; July 6, 2010–subjective pain at 6 out of 10; September 8, 2010–relief with subjective pain at 2 out of 10; October 28, 2010–subjective pain at 8 out of 10; February 3, 2011–relief with subjective pain at 3 out of 10; March 30, 2011–subjective pain at 8 out of 10; April 26, 2011–subjective pain at 6 out of 10; June 20, 2011–subjective pain at 9 out of 10; July 15, 2011–relief due to pain pump; October 10, 2011–subjective pain at 7 out of 10; and December 9, 2011–subjective pain at 5 out of 10.

These records include both facial pain as well as back and leg pain. Dr. Orbegozo discusses the combination of her pain in the August 1, 2011 opinion letter. Overall, it appears that Plaintiff has not had a period of sustained remission from her pain and the resulting limitations. Although her facial pain appears to have improved with treatment, she continued to report pain, and in the most recent record in December 2011, she reported that her facial pain was returning. The ALJ's failure to discuss this favorable evidence in support of his finding that the treating physician's opinion was not entitled to controlling weight does not create a logical bridge to sufficiently allow this Court to follow the ALJ's line of reasoning.

In addition, the ALJ erred by giving greater weight to the opinions of the non-examining state agency medical consultants, both of whom are internists. Dr. Corcoran's October 20, 2010 form opinion consists of a checkmark next to the phrase "not severe for duration of 12 months" with the additional typed phrase: "Review of evidence shows clmt has credible [medically determinable impairment] of trigeminal neuralgia, but has not been documented unresponsive to medical

intervention. Controlling weight given to TP pain specialist Dr. M. Orbegozo [9/08/10] medical record)." (AR 531). The September 8, 2010 treatment note was the result of the installation of the pain pump. However, on October 28, 2010, Plaintiff returned two days after a pump refill that did not contain a narcotic, stating that her pain had returned. As a result, Dr. Orbegozo added Dilaudid back to the mixture. He wrote, "Pain is [back] to square one since the narcotic was removed." (AR 617). In that same treatment note, Plaintiff described her pain as constant, severe, aching, and burning. In the treatment note for February 3, 2011, when she listed her pain as a 3 out of 10, the physician noted that Plaintiff reported "Pain still is worse in the am. Says that from around noon till 4 is worst." (AR 597). Although it appears that Plaintiff obtained relief from her facial pain, it is unclear how the residual pain she appeared to continue to suffer in combination with her leg and wrist pain would not have more than a minimal effect on her ability to do basic work activities.

Despite the February 3, 2011 treatment note, on March 1, 2011, Dr. Brill affirmed Dr. Corcoran's opinion "as written," checking the line that he had "reviewed all the evidence in the file." (AR 547). There is no reference by either consultative reviewer to an awareness of the ongoing nature of Plaintiff's pain. Moreover, on December 9, 2011, Plaintiff saw her treating physician for a pump refill for her chronic left facial pain and reported that "she is noticing that intermittently she is having increased pain in left jaw," with the pain occurring a few times in the previous month. (AR 702). At that visit, she reported her pain as a 5 on a scale of 10. Thus, it was improper for the ALJ to give greater weight to the opinion of the nonexamining sources.

Because the proper weighing of the opinions of the treating physician and of the consultative reviewers may affect the ALJ's determination of whether Plaintiff suffers from a severe impairment or combination of impairments, the Court grants Plaintiff's request for remand.

## B. Plaintiff's Credibility

Plaintiff contends that remand is required because the ALJ made several errors in assessing her credibility. In making a disability determination, the ALJ must consider a claimant's statements about her symptoms, such as pain, and how the claimant's symptoms affect her daily life and ability to work. *See* 20 C.F.R. § 404.1529(a). Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id*. In determining whether statements of symptoms contribute to a finding of disability, the regulations set forth a two-part test: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the alleged symptoms; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. *Id*.

The ALJ must weigh the claimant's subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). An ALJ is not required to give full credit to every statement of pain made by the claimant or to find a disability each time a claimant states she is unable to work. *See Rucker v. Chater*, 92 F.3d 492, 496 (7th Cir. 1996). However, Ruling 96-7p provides that a claimant's statements regarding symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because they are not substantiated by objective evidence."

SSR 96-7p, 1996 WL 374186, at *6 (Jul. 2, 1996). "Because the ALJ is 'in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

As an initial matter, Plaintiff notes that the ALJ used "boilerplate" language in the credibility determination by stating that "the claimant's statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not credible to the extent they are inconsistent with finding that the claimant has no severe impairment or combinations of impairments for the reasons explained below." (AR 23); *see, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). However, an ALJ's use of the boilerplate language does not amount to reversible error if he "otherwise points to information that justifies his credibility determination." *Pepper*, 712 F.3d at 367-68. In this case, the use of "boilerplate" language does not require remand because the ALJ considered the required factors in assessing Plaintiff's credibility and analyzed the evidence to explain his credibility determination while assessing the severity of Plaintiff's impairment. *See Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012).

Next, Plaintiff contends that the ALJ was operating under a belief that Plaintiff's pain was in significant remission. Plaintiff contends that this belief is not supported by the record and that the ALJ inappropriately interprets the MRI evidence and relies upon this "raw medical data." Plaintiff rightly points out that the Seventh Circuit Court of Appeals has warned ALJs against playing doctor

and making their own medical findings because a lay person's common sense and intuitions about the medical incidents are often wrong. *Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990); *see also Rohan v. Chater*, 98 F.3d 966 (7th Cir. 1996). In this case, however, the ALJ did not play doctor by interpreting medical evidence; rather, the ALJ restated the objective MRI results.

Nevertheless, the ALJ's failure to consider the ebb and flow of Plaintiff's pain during the attempts at various pain management techniques and the general focus on treatment notes showing improvement at the expense of the notes to the contrary, including the most recent recurrence of facial pain after what appeared to be a period of control of the pain, adversely affects the credibility determination. *See* (AR 24). Because the Court is remanding to allow the ALJ to properly weigh physician opinions, on remand, the ALJ shall consider all of the pain treatment records in assessing Plaintiff's credibility.

Third, Plaintiff contends that the ALJ overly relied upon Plaintiff's daily activities and that the ALJ should not have compared what could be sporadic, daily activities with the requirements of a full-time job that requires working 40 hours a week. It is true that the ability to do daily activities does not by itself support an ALJ's conclusion that a claimant can work a full time job. *See Bjornson*, 671 F.3d at 647; *Punzio*, 630 F.3d at 712; *Spiva v. Astrue*, 628 F.3d 346, 351-52 (7th Cir. 2010). The ALJ, however, did not find that the Plaintiff could work because she did various daily tasks. Instead, the ALJ noted that there were inconsistencies with Plaintiff's testimony and other evidence in the record and that these inconsistencies made the ALJ question the Plaintiff's credibility by wondering if she was performing at a higher level than reported.

Plaintiff's final contention is that the ALJ suggested that Plaintiff engaged in drug seeking behavior and that this was unsupported by the record. Plaintiff contends that, other than one warning

by her doctor reminding her of her narcotic contract with PCC and advising her that she could not request narcotic medications from an ER, there is no evidence in the record to support the conclusion that she was engaged in drug seeking behavior. This is not entirely correct, as additional records support the ALJ's consideration of Plaintiff's use of medication. For example, the ALJ noted instances in the record when Plaintiff took more of her medicine than was prescribed and ran out early[1] and when Plaintiff received narcotic pain medications from the emergency room after being warned that such actions violated her narcotic contract with PCC.[2] Nevertheless, most of those instances occurred early in her treatment and prior to the implantation of the intrathecal pain pump. Also, at no time did her physicians deny her medication, nor did any of her treating physicians note substance abuse or dependence. On remand, the ALJ shall consider these other factors in weighing Plaintiff's use of medication in determining her credibility.

## C. Request for an Award of Benefits

Finally, Plaintiff asks that the Commissioner's decision be reversed and remanded for an award of benefits. An award of benefits, however, is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe*, 425 F.3d at 356)). This is not one of those rare situations. The ALJ failed to consider all of the evidence in the record when determining what weight to give to

---

[1] On January 13 and 16, 2009, and on Feb. 3, 2009, Plaintiff ran out of medicine two weeks early. (AR 455-58). On March 25, 2009, Plaintiff was out of medicine early and was taking more than prescribed. (AR 448-51). On April 8, 2009, Plaintiff was out of medicine two days early (AR 446). On May 26, 2009, Plaintiff was out of medicine early. (AR 439). On June 9, 2009, Plaintiff was taking more medication than prescribed. (AR 437). On April 23, 2010, and May 17, 2010, Plaintiff was taking more medication than prescribed (AR 664-67).

[2] On March 9, 2009, Plaintiff's physician warned her not to request narcotics from the emergency room. (AR 453). On May 26, 2009, Plaintiff told emergency room personnel that she was supposed to come for pain shot and she received Dilaudid–a narcotic (Ar. at 317-22).

Plaintiff's treating physician's opinion and in assessing Plaintiff's credibility, thus leaving issues unresolved. Moreover, although Plaintiff requests an award of benefits, Plaintiff fails to present an argument in favor of doing so. The unresolved issues that exist can only be resolved through further proceedings on remand. Accordingly, this matter is remanded for further proceedings.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief [DE 11], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order. The Court **DENIES** Plaintiff's request to award benefits.

So ORDERED this 29th day of July, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record